UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

FUNDADOR PADILLA,                                    :

                               Plaintiff,            :

            - against -                              :        **REPORT AND**
                                                              **RECOMMENDATION**
CAROLYN W. COLVIN,                                   :        **TO THE HONORABLE**
Acting Commissioner of Social Security,[1]                    <u>**COLLEEN MCMAHON**</u>
                                                     :
                               Defendant.            :        10 Civ. 4762 (CM) (FM)
--------------------------------------------------------x

<table>
<tr><td>USDC SDNY</td></tr>
<tr><td>DOCUMENT</td></tr>
<tr><td>ELECTRONICALLY FILED</td></tr>
<tr><td>DOC #: _____</td></tr>
<tr><td>DATE FILED:   <u>8/15/2013</u></td></tr>
</table>

**FRANK MAAS**, United States Magistrate Judge.

        <u>Pro se</u> plaintiff Fundador Padilla ("Padilla") brings this action pursuant to Section 405(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI").  (ECF No. 4).  The Commissioner has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (ECF No. 16).  For the reasons set forth below, that motion should be granted.

---

[1]      The Court takes judicial notice that Michael J. Astrue is no longer the Commissioner of Social Security.  <u>See</u> Fed. R. Evid. 201(b).  Accordingly, Acting Commissioner Colvin is automatically substituted as the defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

I.      Procedural Background

        This case has an unusually lengthy procedural history.  Padilla first filed for

DIB and SSI on November 29, 1994.  (Tr. 64-67).[2]  In his application, Padilla claimed

that he was disabled due to chronic head pain.  (Id. at 121).  His application was denied

initially, which decision was affirmed on reconsideration.  (Id. at 69-72, 77).  Padilla then

requested a hearing before an administrative law judge ("ALJ").  (Id. at 86).  On August

7, 1996, ALJ Robin J. Arzt held a hearing at which Padilla appeared without counsel.  (Id.

at 21-63).  The ALJ informed Padilla of his right to legal representation, but he elected to

proceed pro se.  (Id. at 23-35).

        On December 18, 1996, after reviewing Padilla's case de novo, the ALJ

issued a decision concluding that Padilla was not disabled within the meaning of the Act.

(Id. at 10-17).  The ALJ's decision was rendered final upon the Appeals Council's denial

of Padilla's request for review.  (Id. at 3-4).  After Padilla appealed to this Court, Judge

Stein affirmed the ALJ's decision.  (Id. at 197); Padilla v. Apfel, No. 98 Civ. 1341 (SHS),

1999 WL 1256251 (S.D.N.Y Dec. 22, 1999).  On July 12, 2000, however, the Second

Circuit remanded the case for further administrative proceedings.  (Tr. 197-98).  The

Court of Appeals directed the ALJ to (a) obtain certain medical records underlying the

Veteran Administration's ("VA") finding that Padilla was disabled for VA purposes in

connection with determining when Padilla first became disabled, and (b) consider

_____

        [2]      Citations to "Tr." refer to the certified copy of the administrative record filed with
the answer.  (ECF No. 11).  Padilla's SSI application apparently was not included in the record.
(See Comm'r's Mem. of Law ("Comm'r's Mem.") (ECF No. 17) at 1 n.1).

whether and to what extent Padilla's disability insurance benefits coverage was affected by work he had performed in 1987.  (Id. at 197).

On April 10, 2001, ALJ Arzt held a supplemental hearing.  (Id. at 362-85). Following that hearing, on June 28, 2001, the ALJ again ruled that Padilla was not disabled.  (Id. at 265-78).  On November 15, 2002, the Appeals Council remanded the case for yet another hearing, directing that the ALJ "give further consideration to the degree of functional restriction imposed on [Padilla] by his impairments during the periods at issue," and "obtain evidence from a vocational expert to clarify the effect of the assessed limitations imposed on [Padilla]."  (Id. at 283-84).  ALJ Paul A. Heyman held that hearing on February 13, 2003.  (Id. at 386-422).  On August 1, 2003, ALJ Heyman rendered a decision in which he denied Padilla's claims for DIB and SSI based on a finding that Padilla was not under a disability during the time period of June 1992 through September 1997.  (Id. at 174-84).  On January 12, 2005, that ruling became final after the Appeals Council declined to assume jurisdiction over the case.  (Id. at 167-69).

On June 17, 2010, more than five years after having received notice of the Commissioner's final decision, Padilla commenced this action, seeking review of the Commissioner's denial of his claims.  (ECF No. 2).  In light of the lengthy delay before Padilla filed his complaint, Chief Judge Preska directed that Padilla file an amended complaint explaining why his suit should be considered timely.  (ECF No. 3).  On June 2, 2011, after Padilla had filed his amended complaint, (ECF No. 4), the Appeals Council granted him additional time to file, rendering the timeliness concern moot.  (See Tr. 166).

3

The Commissioner then filed an answer to the amended complaint on July 6, 2011, (ECF No. 11), and subsequently moved for judgment on the pleadings on September 9, 2011. (ECF Nos. 16, 17).  In response, Padilla has filed a brief opposition affirmation.  (ECF Nos. 18, 19).  The Commissioner did not reply.

The issue presented by the Commissioner's motion is whether the ALJ's determination that Padilla was not disabled within the meaning of the Act is legally correct and supported by substantial evidence.

II.    Factual Background

A.    Vocational and Nonmedical Evidence

Padilla was born in Puerto Rico on September 2, 1932, making him sixty-two years old at the time he filed his application.  (Tr. 33, 35, 68, 402).  He completed school through the eighth grade and can read and write in English, although not perfectly. (Id. at 35-36, 402-03).  In 1952, Padilla joined the United States Army, in which he served for five years before receiving an honorable discharge in 1957.  (Id. at 399).  In the 1950s, Padilla sustained a head injury during Army training, causing him to suffer from headaches, throat pain, and sinus problems, all of which allegedly persisted throughout the relevant period in this case.  (Id. at 29-32).  Following his separation from military service, Padilla completed a year-long vocational program, through which he learned to paint cars and perform body work.  (Id. at 36, 403).  He found full-time employment at a used car dealership, where he worked for about twenty-six years, doing body repair work that included painting, sanding, and replacing windows.  (Id. at 36-39, 125, 403).

4

After Padilla's employer laid him off in December 1991, he did not return to work.  (Id. at 40-41, 403-04, 408-09).  He evidently collected unemployment benefits for at least six months, although he himself could not remember how long those benefits lasted.  (Id. at 41-43).  Originally, when Padilla filed for DIB and SSI, he alleged that he had been disabled and could not work as of January 16, 1992.  (Id. at 64-67).  When the ALJ suggested to Padilla that his receipt of unemployment benefits ran counter to his claim of disability, Padilla agreed to amend his disability onset date to June 29, 1992.  (Id. at 42).  Thus, the period at issue in this case is from June 29, 1992, the date Padilla alleges he became disabled, to September 30, 1997, when Padilla reached the age of sixty-five.[3]  (See Comm'r's Mem. at 1 n.3).

During the relevant period, Padilla lived alone in a fifth floor walk-up apartment in the Bronx.  (Tr. 33).  He was able to climb the five flights of stairs by himself, and could walk for several blocks with ease, but would begin to feel dizzy after standing for more than ten minutes.  (Id. at 33, 47-48).  He could sit comfortably for one-half hour at a time.  (Id. at 49).  He experienced no difficulty traveling on buses or trains.

---

[3]     The relevant period for Padilla's SSI and DIB claims differ.  Since a claimant is not eligible for SSI benefits for any month before the month in which his application is filed, the earliest month in which Padilla would have been eligible for SSI was November 1994, the month when he filed his applications.  See 20 C.F.R. § 416.335.  The change in his disability onset date therefore had no effect on his SSI claim.  The relevant period for that claim ended in September 1997, the month he turned sixty-five, thus entitling him to SSI based upon his age without a showing of disability.  20 C.F.R. § 416.202(a)(1).  A claim for DIB requires a plaintiff to show that his disability began at a time when he met the insured status requirements, i.e., in this case, before December 31, 1996, which was Padilla's last date insured.  20 C.F.R § 416.130, 404.131, 404.315(a), 404.320(b).

5

(Id. at 34).  He could lift up to fifty pounds.  (Id. at 50).  In the questionnaire submitted along with his disability application, Padilla also indicated that he was able to cook on a daily basis, clean when necessary, and watch television.  (Id. at 124).

    B.    Medical Evidence

        1.    Evidence During the Relevant Time Period at Issue

On January 4, 1995, Dr. Joseph A. Grossman examined Padilla at the Commissioner's request.  (Id. at 129-39).  During the examination, Padilla complained of headaches, sinus pain, and shortness of breath.  (Id. at 129).  He told Dr. Grossman that he had stopped working in 1991 because he could not tolerate paint exposure.  (Id.).  He also said that he spent his time watching television, reading, cooking, cleaning, and taking care of his household.  (Id.).

In his report, Dr. Grossman noted that Padilla had "mil[d] ethmoid tenderness,"[4] but that his nostrils were open.  (Id.).  Upon examination, Padilla's gait and station were normal, and he appeared to have no difficulty undressing and getting on or off the examination table.  (Id.).  His lungs were resonant to percussion, and his chest examination revealed no rales, rhonchi, or wheezes.  (Id. at 130).  Padilla's heart rate was normal, and a review of his neck, spine, abdomen, and joints revealed no irregularities.  Padilla had normal muscle strength and exhibited no signs of muscle wasting, clubbing, cyanoisis, edema, dermatitis, or ulceration.  (Id.).

---

[4]    The ethmoid sinuses are "situated in a lateral part of the ethmoid bone alongside the nose and consist[] of ethmoidal air cells."  http://www.merriam-webster.com/medlineplus/ethmoid (last visited August 12, 2013).

Both Padilla's electrocardiogram ("EKG") and chest x-ray results were normal. (Id. at 131-32). A pulmonary function test revealed a moderate restrictive impairment. (Id. at 133-37). Based on Padilla's physical examination and test results, Dr. Grossman diagnosed a history of headaches, history of sinus pain, history of shortness of breath, and probable sinus disease. (Id. at 131). In his functional assessment, Dr. Grossman concluded that Padilla had no impairment bending, crouching, stooping, standing, sitting, lifting, carrying, using hand or foot controls, pushing, or pulling. (Id.). Dr. Grossman also determined that Padilla had no speech or eyesight restrictions. (Id.).

On or about February 22, 1995, Dr. C. Ford, a state agency medical consultant, reviewed Padilla's medical file, reporting that Padilla had no exertional, postural, manipulative, visual, communicative, or environmental limitations. (Id. at 78-85). Dr. Ford did note that Padilla had complained of headaches and exposure to paint fumes at his past job, but pointed out that Padilla had never sought medical treatment and that his physical examination (including his pulmonary function test) was "essentially normal." (Id. at 83). Dr. Ford concluded that any impairment Padilla might have was "slight." (Id.). On June 2, 1995, Dr. C. Levitt, another state agency medical consultant, reviewed Dr. Ford's report and concurred. (See id. at 85).

On May 10, 1995, Padilla saw Dr. Ashok D. Bajracharya at the Morrisania Neighborhood Family Care Center ("Morrisania" or "Morrisania Hospital"). (Id. at 247, 348). He complained of sinus problems and reported that his eyes often would tear up. (Id.). Padilla's EKG revealed no irregularities and his chest x-ray results were normal for

7

his age.  (Id. at 349-51).  An examination of Padilla's sinuses showed that he had "less

aeration of the right frontal sinus than the left," but that his sinuses were otherwise

normal.  (Id. at 349).

On June 9, 1995, Padilla returned to see Dr. Bajracharya at Morrisania.  Dr.

Bajracharya noted that all of Padilla's test results were normal, although a PPD skin test

for tuberculosis the prior month apparently was positive.  The doctor diagnosed Padilla

with allergic rhinitis for which he prescribed medication.  (Id. at 252).

Padilla followed up with Dr. Bajracharya on September 7, 1995.  (Id. at

251, 345).  Padilla reported no "particular problem" other than his allergic rhinitis for

which he was prescribed Dimetapp.  (Id. at 251).

More than one year later, on January 7, 1997, Padilla returned to Morrisania

for a "health maintenance follow up visit."  The examiner noted Padilla's history of

allergic rhinitis, rhinorrhea,[5] and headaches, but found that Padilla's chest x-ray results

were normal.  The examiner did not prescribe any medications for Padilla's headaches or

sinuses.  Padilla was started on INH prophylaxis, presumably because of his positive PPD

test results.[6]  (Id. at 221).

The record also contains medical reports and treatment notes from the

Bronx VA Hospital.  (Id. at 202-212).  On March 13, 1996, Padilla went to the VA

_____

[5]       Rhinorrhea is defined as "the free discharge of a thin nasal mucus."  Dorland's
Illustrated Medical Dictionary 1462 (27th ed. 1988) (hereinafter "Dorland's").

[6]       INH is an abbreviation for isoniazid, a crystalline compound commonly used in
treating and preventing tuberculosis.  See Dorland's at 860.

8

Hospital complaining of an odor coming from his nose and dry eyes.  He apparently requested Seldane, an allergy medication, but was prescribed Benadryl.  (Id. at 202).

On February 12, 1997, Padilla returned to the VA Hospital, where Dr. Anthony Go examined him.  Dr. Go noted Padilla's history of chronic headaches since 1957.  He prescribed Tylenol on an as-needed basis and advised him to return in six months.  (Id. at 203).

Padilla saw Dr. Go again six months later, on August 25, 1997, for a follow-up examination.  Padilla still complained of chronic head pain as a result of his headaches, but reported that the pain was relieved by Tylenol.  The doctor indicated in his notes that Padilla's headaches possibly were connected to a prior head trauma.  He again prescribed Tylenol as-needed and referred Padilla to a neurologist with instructions to return again in six months.  (Id. at 204).

2.    Evidence After the Period at Issue

Padilla next saw Dr. Go at the VA Hospital on February 23, 1998.  (Id. at 205).  Dr. Go noted that, in addition to chronic headaches, Padilla had symptoms of exertional angina.  (Id.).  He therefore recommended that Padilla take a stress test and begin a low salt/low cholesterol diet.  (Id.).  On March 2, 1997, Padilla underwent a stress test, the results of which were negative.  (Id. at 209).

Over the following years, Padilla continued to have follow-up visits at the VA Hospital.  (Id. at 207-08, 210-11, 287, 318-35).  On May 20, 1999, Padilla saw Dr. Go, reporting that he generally felt well, regularly walked for two miles a day, and had

regular bowel movements.  (Id. at 211).  On March 2, 2000, he again saw Dr. Go,

complaining of depression, insomnia, and headaches that he said he had experienced for

the past fifty years.  (Id. at 214).  Noting that Padilla's depression screening was positive,

Dr. Go referred him to a psychiatrist, although it does not appear that Padilla ever acted

on that referral.  (Id. at 217).

On September 14, 2000, Padilla returned to the VA Hospital seeking

treatment in connection with chronic rhinitis, "congestion" in one of his nostrils, and high

cholesterol.  Dr. Go noted that the results of a physical examination of Padilla were

essentially normal.  His chest exam was clear and he had "normal respiratory

movements."  He had full motor capabilities and intact sensation.  Dr. Go prescribed

Lovastatin for Padilla's high cholesterol and Beconase spray for his rhinitis.  He also

recommended that Padilla continue with a low salt diet and regular exercise.  (Id. at 287).

During a further follow-up visit, on April 9, 2001, Dr. Go again suggested

that Padilla visit a mental health professional, which Padilla refused to do.  (Id. at 323).

Dr. Go also recommended that Padilla regularly engage in at least thirty minutes of

moderate physical activity three times a week.  (Id. at 324).  In a subsequent follow-up

visit, on September 13, 2001, Dr. Go referred Padilla to a neurologist for a CT headscan,

which Padilla refused to have.  (Id. at 321).  Dr. Go noted that Padilla's headaches were

controlled by Tylenol and that his rhinitis and cholesterol were stable with medication.

(Id.).  Finally, during a visit to the Neurology Clinic at the VA Hospital on October 1,

2001, Padilla reported that he continued to have headaches, which he said were "not very

10

strong," but still bothered him.  (Id. at 319).  He explained that Tylenol relieved his pain, and said that sometimes he would lay down and sleep to forget about his headaches. (Id.).

C.  Administrative Hearing Testimony

1.  Padilla's Testimony

At the first hearing, in August 1996, Padilla complained of headaches, throat pain, and sinus problems, which he said had developed after his head injury.  (Id. at 32).  He testified that, since then, he had experienced occasional spells of dizziness and fevers that would last for a few minutes at a time.  (Id. at 43-45, 48, 60).  In 1984, he was taken to the hospital because he felt like he was going to pass out.  (Id. at 52). Additionally, he sometimes would feel pain around his temples, which would subside after three or four minutes.  (Id. at 59).  These symptoms remained the same as they had been since about 1957.  (Id. at 52).  In 1994 and 1995, Padilla had trouble breathing through his nose due to nasal congestion, but that problem apparently was completely resolved by medication.  (Id. at 45-46).  Occasionally he would feel some chest pain, but only when he was sick with a cold.  (Id. at 61).

Padilla's job at the auto body shop required him to be on his feet all day, constantly bending and reaching.  (Id. at 39, 126).  Although Padilla seemed to indicate at the hearing that the heaviest objects he would lift at work were forty-pound plastic bumpers, (id. at 39), he previously had reported in the questionnaire accompanying his

disability application that he would sometimes lift up to 100 pounds, and that he frequently lifted over fifty pounds.  (Id. at 126).

In December 1995, Padilla began receiving a monthly non-service-related disability pension from the VA.  He testified, however, that he did not know or attempt to determine the medical conditions for which he was receiving benefits.  (Id. at 155, 53-54).  At around that time, Padilla began taking Diphihenhydramine, an antihistamine used to treat allergies, which he received from the VA.  (Id. at 55).

At his second hearing, on April 10, 2001, Padilla testified that he began receiving treatment at Morrisania in 1987 for a sinus and nasal condition, and that his treatment there continued until 1997.  (Id. at 373-74).  He also received some treatment at a VA Hospital.  (Id. at 374).  Padilla at some point was diagnosed with a lung condition, for which he was offered medication that he refused.  (Id. at 374, 376).  As a result of the lung condition, Padilla experienced difficulty breathing and some pain in the middle of his chest, particularly when he walked long distances.  (Id. at 377).

Padilla testified that he took over-the-counter Tylenol for his headaches and used a nasal spray for his sinus condition.  (Id. at 378).  He also had been taking medications for high blood pressure and high cholesterol since approximately 2000.  (Id. at 379).  Padilla experienced no side affects from these medications, but complained that he felt depressed and could not sleep.  (Id. at 380).  He did not seek psychiatric or mental health care, however, because he did not believe that he was "sick" in that way.  (Id.).

Padilla testified that he could stand for up to one-half hour, and had no difficulty sitting down.  (Id. at 381-83).  He was capable of walking for five or ten blocks and could bend down if necessary.  (Id. at 381-82).  He could carry one gallon of milk, but not two.  (Id. at 383).  He spent most of his time at his apartment watching television. (Id. at 381).  A female friend of his sometimes would come to his apartment to cook and clean for him.  (Id.).  Occasionally, Padilla would go to the grocery store or talk to a friend.  (Id.).

On February 13, 2003, at the third hearing before ALJ Heyman, Padilla reported that he no longer lived alone:  in 1998, his stepson moved into his apartment, and by the time of the hearing, his girlfriend also was living there.  (Id. at 398-99).  Padilla explained he had developed headaches a "long time ago," which persisted throughout the relevant period.  (Id. at 410).  The headaches, he said, felt like "acid" was pouring down either his back or the back of his head.  (Id.).  Padilla testified that, in addition to the headaches, he had a lung condition that first had been diagnosed during a visit to Morrisania in 1995.  (Id. at 406).  After that, he began to seek treatment at the VA Hospital in Kingsbridge, but never was admitted overnight.  (Id. at 407-08).  Padilla confirmed that a doctor at the VA Hospital had referred him to a mental health specialist but that he refused to go because he did not like how he had been treated.  (Id. at 410-11).

2.    Vocational Expert's Testimony

Edna Clark, a vocational rehabilitation counselor, testified at the third hearing.  (Id. at 414).  Ms. Clark stated that an individual such as Padilla, with limited

education, who was restricted to work at the medium exertional level[7] in a clean-air

environment could not work as an auto body repairman due to fumes and dust.  (Id. at

416-17).  Ms. Clark testified that there were other jobs in significant numbers in the

national economy, however, that would be suited to a person with such qualifications.

(Id. at 417).  Specifically, such an individual could work as a hand packer (DOT 920.587-

018), which is medium, unskilled work, with 50,000 jobs existing nationally and 1,000

regionally, or as a bus person (DOT 311.677-018), which is also medium, unskilled work,

with 300,000 jobs existing nationally and 20,000 in the local economy.  (Id.).

    D.    The ALJ's Decision

An "ALJ making a decision in a case on remand from the Appeals Council

. . . is to consider the case de novo, when the Appeals Council has vacated the ALJ's

previous decision."  Uffre v. Astrue, No. 06 Civ. 7755 (GWG), 2008 WL 1792436, at *7

(S.D.N.Y. Apr. 18, 2008).  For this reason, although I have summarized the testimony at

the two prior hearings before ALJ Arzt, which ALJ Heyman also made reference to in his

decision, the correctness of the Commissioner's decision ultimately turns on ALJ

Heyman's findings of fact following the third hearing.

In his decision dated July 25, 2003, ALJ Heyman found that Padilla was not

disabled within the meaning of the Act and, therefore, denied his claims for DIB and SSI.

---

[7]    A person is capable of performing work at the medium excertional level if they are able to lift up to twenty-five pounds on a regular basis and not more than fifty pounds on an occasional basis.  See 20 C.F.R. §§ 404.1567(c), 416.967(c).

(Tr. 177-84).  In reaching that conclusion, the ALJ applied the five-step sequential analysis required by 20 C.F.R. §§ 416.1520 and 416.920.

At Step One, the ALJ determined that Padilla had been unemployed since he was laid off from the auto body shop in 1991, and that he had not engaged in substantial gainful activity since the disability onset date.  (Id. at 180, 183).

At Step Two, the ALJ found that Padilla's only severe impairment was moderate restrictive lung disease.  (Id.).  He concluded that Padilla's recurring headaches, allergic rhinitis, sinus condition, and mild hypertension did not qualify as severe impairments because none of these conditions had had an appreciable effect on Padilla's ability to perform basic work activities.  (Id. at 181).  He noted that Padilla had sought treatment for these conditions only sporadically during the relevant period, and that the medical evidence made no reference at all to any functional restrictions that may have resulted from them.  (Id.).  The ALJ further pointed out that Padilla's headaches had existed since his injury in the 1950s, but that he nevertheless had been able to work until he was laid off in 1991.  (Id.).  Additionally, the ALJ noted that Padilla's headaches had been treated only with Tylenol.  (Id. at 180).  Finally, with respect to his hypertension, the ALJ concluded that the medical reports did not reveal the existence of any resultant end organ damage or otherwise debilitating condition.  (Id.).

Turning to Step Three of the analysis, the ALJ determined that Padilla's moderate restrictive lung disease, which qualified as a severe impairment under Step Two, was "not severe enough to meet or medically equal" an impairment listed in

15

Appendix 1.  (Id. at 180, 183).  The ALJ reached this conclusion by comparing the forced

vital capacity ("FVC") and forced expiratory volume per second ("$FEV_1$") values in

Padilla's 1995 pulmonary function test with the severity criteria set forth in Section 3.00

of Appendix 1.  (Id. at 180).

At Step Four, the ALJ concluded that Padilla retained the residual

functional capacity ("RFC") to perform a wide range of "medium" work in a clean-air

environment.  (Id. at 180-81).  The ALJ based this determination on his review of medical

reports subpoenaed from Morrisania Hospital, the VA Hospital, and the Bronx Municipal

Hospital Center, for the years 1992 to 1997, all of which the ALJ found added "nothing . .

. which would indicate a more restrictive residual functional capacity th[a]n was

previously found in the prior July 2001 decision."  (Id. at 179).  The ALJ further

considered the evidence that was before ALJ Arzt, noting the absence of any medical

opinion suggesting that Padilla was in any way restricted or limited by his headaches,

allergic rhinitis, and sinus condition.  (Id. at 181).  Indeed, a review of Padilla's blood

tests, EKG, and chest x-rays was "generally unrevealing."  (Id.).  The ALJ noted,

however, that Padilla's pulmonary function study did reveal a moderate restrictive lung

impairment.  (Id. at 180).

The ALJ found Padilla's hearing testimony "generally credible and

consistent with the medical evidence contained in the record."  (Id.).  Nonetheless, he did

not credit Padilla's claim that he was incapable of working at all, since that testimony was

not supported by the medical evidence.  (Id.).

16

Although the ALJ determined that Padilla was capable of performing medium work, he concluded that Padilla could not perform his past relevant work, painting and performing auto body work, because his lung condition limited him to clean-air environments and working at the body shop would necessarily involve the inhalation of noxious fumes.  (Id. at 181).

Thus, the ALJ turned to Step Five and considered whether Padilla was capable of working other jobs that existed in sufficient numbers in the national economy consistent with his age, education, and work experience.  To satisfy that inquiry, the ALJ first consulted the Medical-Vocational Guidelines, often referred to as the "Grids."  (Id. at 182); see Calzada v. Astrue, No. 09 Civ. 3926 (RJS) (MHD), 2010 WL 4683570, at *14 (S.D.N.Y. Nov. 17, 2010).  The ALJ found that Padilla, who was 59 years old at the time he filed his claim in June 1992, was of "advanced age" and "closely approaching retirement age" during the relevant time period.  (Tr. 182).  He also recognized that Padilla had only limited education, and his experience in skilled, medium work was not transferrable to other occupations.  (Id.).  The ALJ noted that when a claimant is capable of performing the full range of medium work, the Grids direct a finding of "not disabled." (Id.); see 20 C.F.R. Part 404, Subpart P, App. 2.  Padilla's ability to perform medium work was impeded, however, by "additional exertional and/or non-exertional limitations," namely, the need to work in a clean-air environment.  (Tr. 182).  Accordingly, the ALJ deferred to Ms. Clark's testimony in deciding whether Padilla could make a vocational adjustment to other work in an environment "free of temperature and humidity extremes

17

such as exposure to dust, chemicals, smoke, noxious inhalants, and extremes of cold or

heat." (Id.).  Relying on Ms. Clark's testimony, the ALJ found that Padilla could work as

a bus person (medium, unskilled work) or as a hand packager (also medium, unskilled

work), and that both jobs existed in significant numbers in the local and national

economies.  (Id.).

As a consequence, the ALJ concluded that Padilla was not disabled.

     E.    Appeals Council

On August 7, 2003, Padilla filed a request for review of ALJ Heyman's

decision.  (Id. at 172).  In that application, Padilla stated (in a single sentence) that he was

requesting review because "[d]uring the year of 1994 I was unable to go to work due to

my condition."  (Id.).  The Appeals Council denied Padilla's request, stating that it had

reviewed all of the issues in the case and "found no reason under [its] rules to assume

jurisdiction."  (Id. at 167).

III.   Discussion

     A.    Standard of Review

Under Rule 12(c), judgment on the pleadings is appropriate when the

material facts are undisputed and a party is entitled to judgment as a matter of law based

on the contents of the pleadings.  See, e.g., Sellers v. M.C. Floor Crafters, Inc., 842 F.2d

639, 642 (2d Cir. 1988); Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 213-14

(S.D.N.Y. 1999).

The Act, in turn, provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g); see Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).  The term "substantial" does not require that the evidence be overwhelming, but it must be "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

A district court is not permitted to review the Commissioner's decision de novo.  Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998)); Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).  Rather, the court's inquiry is limited to ensuring that the Commissioner applied the correct legal standard and that his decision is supported by substantial evidence.  See Hickson v. Astrue, No. CV-09-2049 (DLI) (JMA), 2011 WL 1099484, at *2 (E.D.N.Y. Mar. 22, 2011).  When the Commissioner's determination is supported by substantial evidence, the decision must be upheld, "even if there also is substantial evidence for the plaintiff's position."  Morillo v. Apfel, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001).

B.   Duty to Develop the Record

"Before determining whether the Commissioner's conclusions are supported by substantial evidence, . . . [a court] must first be satisfied that the claimant has had a full hearing under the regulations and in accordance with the beneficent purposes of the Social

19

Security Act." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks, ellipsis, and brackets omitted).  Indeed, an ALJ's failure to develop the record adequately is an independent ground for vacating the ALJ's decision and remanding the case.  Id. at 114-15.  Where the record evidence is inadequate to determine whether an individual is disabled, the ALJ must re-contact the claimant's medical sources to gather additional information.  Schaal, 134 F.3d at 505; Hilsdorf v. Comm'r of Social Sec., 724 F. Supp. 2d 330, 344 (E.D.N.Y. 2010) (citing 20 C.F.R. §§ 404.1512(e), (e)(1)). The ALJ "may do this by requesting copies of [the claimant's] medical source's records, a new report, or a more detailed report from [the] medical source."  20 C.F.R. § 404.1512(e)(1).

Here, ALJ Heyman discharged his duty to develop the record by inquiring at length into Padilla's medical history during the hearing and by subpoenaing the relevant medical records from Morrisania Hospital, the VA Hospital, and the Bronx Municipal Hospital Center for the period from June 1992 through September 1997.  (See Tr. 179). Those records included Padilla's visits with Dr. Bajracharya and Dr. Go, which the ALJ considered together with the report of Dr. Grossman's consultative examination.  Padilla did not indicate, at the hearing or otherwise, that he had received care from any other source during the relevant period.  Thus, the ALJ fully satisfied his obligation to develop the record.

C.   Disability Determination

The term "disability" is defined in the Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§ 416(i)(1)(A).  "[W]hether a claimant is disabled or unable to work is a matter reserved

for the Commissioner."  Rodriguez v. Astrue, No. 02 Civ. 1488 (BSJ) (FM), 2009 WL

1619637, at *16 (S.D.N.Y. May 15, 2009) (citing 20 C.F.R. § 404.1527(e)).  In

determining whether a claimant is disabled, the Commissioner is required to apply the

five-step sequential process set forth in 20 C.F.R. § 404.1520.  The Second Circuit has

described that familiar process as follows:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity.  If he is not, the
> [Commissioner] next considers whether the claimant has a
> "severe impairment" which significantly limits his physical or
> mental ability to do basic work activities.  If the claimant suffers
> such an impairment, the third inquiry is whether, based solely on
> medical evidence, the claimant has an impairment which is listed
> in Appendix 1 of the regulations.  If the claimant has such an
> impairment, the [Commissioner] will consider him disabled
> without considering vocational factors such as age, education,
> and work experience . . . .  Assuming the claimant does not have
> a listed impairment, the fourth inquiry is whether, despite the
> claimant's severe impairment, he has the residual functional
> capacity to perform his past work.  Finally, if the claimant is
> unable to perform his past work, the [Commissioner] then
> determines whether there is other work which the claimant could
> perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d

464, 467 (2d Cir. 1982)); accord Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008).

The claimant bears the burden of proof with respect to the first four steps of

the five-step process.  DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998).  If the

Commissioner finds that a claimant is disabled (or not disabled) at an early step in the

process, he is not required to proceed with any further analysis.  20 C.F.R.

§ 404.1520(a)(4); <u>Williams v. Apfel</u>, 204 F.3d 48, 49 (2d Cir. 1999).  However, if the

analysis reaches the fifth step of the process, the burden shifts to the Commissioner to

show that the claimant is capable of performing other work.  <u>DeChirico</u>, 134 F.3d at 1180.

       In assessing whether a claimant has a disability, the factors to be considered

include:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such

facts; (3) subjective evidence of pain or disability testified to by the claimant or other[s];

and (4) the claimant's educational background, age, and work experience."  <u>Rivera v.</u>

<u>Harris</u>, 623 F.2d 212, 216 (2d Cir. 1980) (internal citations omitted).

IV.    <u>Analysis</u>

       Applying the five-step framework to this case, it is clear that the ALJ's

finding of no disability was supported by substantial evidence.

    A.    <u>First Step</u>

       The first step of the sequential analysis requires the ALJ to determine

whether the claimant has engaged in substantial gainful activity during the period at issue.

20 C.F.R. § 404.1520(a)(4)(i).  Based on Padilla's testimony that he had not worked since

he was laid off from his job as an auto body shop worker in 1991, the ALJ determined that

Padilla had not engaged in substantial gainful activity since the alleged onset of his

disability in 1992.  (Tr. 183).  That finding benefits Padilla, and is consistent with all of

the evidence in the case.  Moreover, the Commissioner does not contest this point.

B.    <u>Second Step</u>

The second step of the sequential analysis requires the ALJ to assess the medical severity of the claimant's impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities.  <u>Id.</u> § 404.1520(c).  At this step, the ALJ does not take into consideration the claimant's age, education, or work experience.  <u>Id.</u>

Here, the ALJ properly determined that Padilla's only severe impairment was moderate restrictive lung disease.  (Tr. 183); <u>see</u> 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  That finding is plainly supported by substantial evidence, including Dr. Grossman's report which noted that a full medical examination indicated that Padilla suffered from no condition other than a moderate restrictive lung impairment.  (Tr. 131-33).  That conclusion was based upon Dr. Grossman's review of the objective results of Padilla's pulmonary function test.  (<u>Id.</u> at 133).  Indeed, Dr. Grossman further noted that, apart from the lung condition, Padilla's functional assessment was essentially normal, and that he had "no impairment for bending, crouching, stooping, standing, lifting, sitting, carrying, using hand or foot controls, pushing, pulling, speech and eye sight."  (<u>Id.</u> at 131).  A consultative physician's report, such as Dr. Grossman's, is substantial evidence upon which an ALJ may base his decision.  <u>Mongeur v. Heckler</u>, 772 F.2d 1033, 1039 (2d Cir. 1983) (per curiam).  Significantly, no other medical assessments or reports in the record conflict with that evaluation or suggest impairments beyond what Dr. Grossman noted in his report.

23

Moreover, because the evidence failed to establish that Padilla's chronic headaches, allergic rhinitis, sinus condition, or mild hypertension significantly limited his ability to perform basic work activities, the ALJ correctly determined that none of these conditions rose to the level of a severe impairment.  See 20 C.F.R. § 404.1520(c).  At the outset, Dr. Grossman's report is silent with respect to any functional difficulties that Padilla might have experienced as a result of his headaches, rhinitis, sinuses, or hypertension.  Padilla's treatment notes similarly lack any suggestion that his headaches, rhinitis, or sinus problems had caused him to suffer any functional limitation.  Indeed, neither Dr. Bajracharya nor Dr. Go ever noted that those conditions resulted in work-related restrictions.

With regard to Padilla's headaches, Dr. Go's recommendation for the use of nothing stronger than over-the-counter Tylenol on an as-needed basis (which Padilla admitted relieved his pain (Tr. 204, 319)) is itself substantial evidence that weighs against a finding of a severe impairment.  Oliphant v. Astrue, No. 11-CV-2431, 2012 WL 3541820, at *17 (E.D.N.Y. Aug. 14, 2012); see also Parra v. Astrue, 481 F.3d 742, 750 (9th Cir. 2007) (evidence of "conservative treatment," such as over-the counter-pain medication is "sufficient to discount a claimant's testimony regarding severity of an impairment"); Maher v. Sec'y of Health and Human Serv., 898 F.2d 1106, 1109 (6th Cir. 1989) (prescription of mild medications sufficient evidence that claimant does not suffer from "severe disabling pain"); Williams v. Bowen, 790 F.2d 713, 715 (8th Cir. 1986) (allegations of disabling pain may be discredited by evidence that the claimant sought only

minimal medical treatment or was prescribed light medications to be used on an occasional basis).

Padilla's rhinitis and sinus condition likewise were managed by medication and there is no indication that either of these conditions caused him any difficulties in performing work functions.  (Tr. 202, 252).  Ailments that are sufficiently controlled by medication and pose only a minimal limitation on a claimant's ability to perform basic work activities do not constitute severe impairments under the Act.  Ortiz v. Astrue, 875 F. Supp. 2d 251, 260 (S.D.N.Y. 2012); Thomas-Bryant v. Commissioner of Social Sec., No. 09 Civ. 7232 (PGG) (FM), 2011 WL 4150952, at *10 (S.D.N.Y. Aug. 26, 2011).

Moreover, Padilla's own testimony at the administrative hearing belied his claim that his headaches, rhinitis, or sinus condition caused him functional limitations. Padilla explained that he had experienced headaches since his accident in the 1950s, but admitted that he had been able to work despite them until eventually being laid off from his job in 1991.  (Tr. 36-41).  The only evidence that Padilla's headaches or sinuses interfered with his ability to work was his testimony that he occasionally would feel feverish or sick at work, requiring him to go to the bathroom to sit for ten to fifteen minutes until he felt better.  (Id. at 53).  Treatable conditions that impose only negligible constraints on daily activity, such as these, however, fail to rise to the level of severe impairments.  See Ortiz, 875 F. Supp. 2d at 260.

Finally, there was no evidence that Padilla's mild hypertension had any effect on his functional capacity during the period at issue; in fact, nothing in the record indicates that he even experienced any symptoms of hypertension prior to September 1997.  Padilla also provided no explanation as to how, if at all, he was limited by this condition.  Even if he had, as the ALJ correctly noted, Padilla's medical records did not reveal the existence of any "debilitating condition."  (Tr. 180).  For example, Padilla's stress test was negative, and his high cholesterol and hypertension were controlled by medication.  (Id. at 209, 321, 326).  Furthermore, Dr. Go's recommendation of diet and regular exercise, (id. at 287), confirms that Padilla still was capable of a wide range of physical activity.  Thus, there was substantial evidence from which the ALJ could find that Padilla's mild hypertension was not a severe impairment.  See Mejia v. Astrue, 719 F. Supp. 2d 328, 341 (S.D.N.Y. 2010) (hypertension does not qualify as a severe impairment if it is controlled by medication and does not affect a claimant's ability to perform a "variety of non-strenuous activities") (collecting cases).

In sum, the ALJ's finding that Padilla's only severe impairment was his moderate restrictive lung condition was supported by substantial evidence.

C.    Third Step

The third step requires the ALJ to determine whether the claimant has an impairment that meets or medically equals an impairment listed in Appendix 1.  20 C.F.R. § 404.1520(a)(4)(iii).  The ALJ must base his decision solely on medical evidence, without regard to the claimant's age, education, or work experience.  Id. § 404.1520(d).  If the ALJ

26

finds that the claimant has an impairment that meets or equals a listing in Appendix 1, the claimant is considered disabled within the meaning of the Act.  Id. §§ 404.1520(a)(4)(iii), (d).  If the claimant's impairment does not meet the criteria in Appendix 1, the ALJ must continue with the five-step analysis.

Padilla's moderate restrictive lung disease must be evaluated under Section 3.00 of the Listings, which pertains to conditions affecting the respiratory system.  20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.00.  "Chronic pulmonary insufficiency," one of the major listed conditions under Section 3.02, is established through pulmonary function testing, which measures a claimant's $FEV_1$ and FVC.  See Rivera .v Commisioner of Social Sec., 728 F. Supp. 2d 279, 329 (S.D.N.Y. 2010).  The claimant's test results then are evaluated by referring to a set of tables in Appendix 1, which compare the claimant's height to his $FEV_1$ and FVC values.

At his consultative examination, Dr. Grossman measured Padilla's height at 66 inches.  (Tr. 136).  Padilla's pulmonary function test results reflected a predicted FVC of 3.7, and an observed FVC before bronchodilator of 3.1.  (Id. at 133, 136).  His $FEV_1$ was predicted at 2.3 liters per second, and observed before bronchodilator at 2.3.  (Id.).  To meet the listing for chronic obstructive pulmonary disease under Section 3.02(A), a claimant of Padilla's height must have a $FEV_1$ equal to or less than 1.35.  20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.02(A) (Table I).  To meet the listing for chronic restrictive ventilatory disease under Section 3.02(B), Padilla would have to have had a FVC of equal to or less than 1.55.  20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.02(B) (Table II).  Padilla's results do not match either listing.

To meet the listing for Cystic Fibrosis, which is a condition listed under Section 3.04, a claimant of Padilla's height must either (1) exhibit a $FEV_1$ equal to or less than 1.75, (2) have reported episodes of bronchitis, pneumonia, hemoptysis,[9] or respiratory failure requiring physician intervention, occurring at least once every two months or at least six times a year, or (3) have a "persistent pulmonary infection" accompanied by "superimposed, recurrent, symptomatic episodes of increased bacterial infection, occurring at least once every six months and requiring intravenous or nebulization antimicrobial therapy." See 20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.04.  Padilla plainly meets none of these criteria.  There is no evidence that indicates that Padilla suffered from any of the remaining relevant afflictions listed in Section 3.00.

Accordingly, ALJ Heyman's determination that Padilla's moderate restrictive lung disease was "not severe enough to meet or medically equal one of the impairments listed in Appendix 1" because his "FVC and $FEV_1$ values contained in the 1995 pulmonary function study clearly d[id] not meet the severity criteria contemplated anywhere in Section 3.00 of App[endix] 1," was supported by substantial evidence.  The ALJ therefore properly advanced to the fourth step of the sequential analysis.

D.    Fourth Step

At Step Four, the ALJ must determine whether the claimant's impairments prevented him from performing his past relevant work, taking into consideration the claimant's symptoms to the extent that they are consistent with objective medical evidence

---

[9]      Hemoptysis is "the expectoration of blood or of blood-stained sputum." Dorland's at 750.

and other evidence.  20 C.F.R. §§ 404.1520(a)(4)(iv), (e)-(f); 404.1560(b)(2).  In making

this evaluation, the ALJ must determine the claimant's RFC.  Id. §§ 404.1545(a)(1), (3).

The ALJ's RFC analysis must "[s]et forth a logical explanation of the effects of the

symptoms, including pain, on the individual's ability to work."  SSR 96-8p, 1996 WL

374184, at *7 (1996).  If the claimant can still perform past relevant work, either as it was

or is performed in the general economy, the ALJ must find that the claimant is not

disabled.  20 C.F.R. § 404.1520(a)(4)(iv).

   Here, the ALJ properly concluded that Padilla retained the RFC to perform

medium work in a clean-air environment.  As previously noted, medium work involves

standing or walking for six hours per day, occasionally lifting and carrying up to fifty

pounds, and frequently lifting or carrying objects weighing up to 25 pounds.  20 C.F.R.

§ 404.1567(c).  The ALJ's finding in this regard was supported both by objective medical

evidence and Padilla's own testimony.

   First, as Dr. Grossman concluded in his report, Padilla had no limitation in

sitting, standing, lifting, carrying, pushing, pulling, using hand and foot controls, bending,

crouching, stooping, seeing, or talking.  (Tr. 131).  Moreover, a clinical examination

revealed no problems with Padilla's gait and station, no sensory deficiencies, and no signs

of muscle wasting, clubbing, cyanosis, edema, dermatitis, or ulceration.  (Id. at 129).

Padilla also apparently had no problem dressing and undressing or getting on and off the

examination table.  (Id.).  His EKG was normal and his chest x-ray was clear.  (Id. at 131-

32).  Upon review of Dr. Grossman's report, both Drs. Ford and Levit concluded that

Padilla had no exertional or non-exertional limitations.  (Id. at 78-85).

   Neither Drs. Bajracharya nor Go indicated in Padilla's treatment records that

he suffered from any functional limitations during the period at issue.  Indeed, the

treatment notes after September 1997 indicate that Padilla had the functional capacity to

perform a wide range of activities.  During a doctor's visit in May 1999, for example,

Padilla reported that he was regularly able to walk two miles per day.  (Id. at 211).  In

March 2000, Padilla told the doctor that he had no difficulties walking or standing, and

stated that he was able to walk five to ten blocks without any trouble.  (Id. at 214).  A

neurological examination in September 2000 revealed full motor strength, normal

sensation, and intact cranial nerves.  (Id. at 287).  Furthermore, Dr. Go's recommendation

that Padilla engage in moderate physical exercise (for at least thirty minutes, three times

per week) in order to reduce his hypertension, did not take account of any physical

limitations.  (Id. at 324).  That recommendation plainly is inconsistent with the notion that

Padilla was incapable of engaging in a wide range of physical work.

   Likewise, the administrative hearing testimony supports the ALJ's finding

that Padilla retained the capacity to do medium work.  At his first hearing, which occurred

nearest in time to the relevant period, Padilla stated that his job at the auto body shop

required him to stand on his feet for long periods and to bend and reach for objects with

some frequency.  (Id. at 39, 126).  Padilla stated that he was capable of lifting up to fifty

pounds, and that he regularly would lift forty pound plastic bumpers.  (Id. at 50).  In the

questionnaire he completed in connection with his disability application, he noted that he occasionally would lift up to one hundred pounds at work.  (Id. at 126).

Although Padilla complained of occasional dizzy spells, fevers, headaches, and difficulty breathing due to nasal congestion, he did not testify that any of these problems hindered his ability to work.  Indeed, most of Padilla's symptoms either were transient, lasting only a few minutes at a time, or were managed effectively by medication. (Id. at 45-46, 59).  Padilla's treatment records further indicate that these conditions were relatively minor, requiring only sporadic visits to the doctor and mild medication.  Finally, and perhaps most importantly, despite the fact that his symptoms had been more or less the same since 1957, (id. at 32), Padilla apparently was able to continue working at his job for more than three decades without incident.  This, and other substantial evidence, supports the ALJ's determination that Padilla retained the capacity to perform medium work.

The ALJ further properly determined that Padilla was unable to perform his past work in the auto body shop, since that job required him to be exposed to noxious fumes, and his lung condition required him to be in a clean-air environment.  (Id. at 181-82).  That finding was supported by Dr. Grossman's report.

E.      Fifth Step

At Step Five, the ALJ must assess the claimant's RFC and determine whether, based on the claimant's age, education, and work experience, the claimant could "make an adjustment to other work."  20 C.F.R. § 404.1520(a)(4)(v).  As part of this analysis, the ALJ must determine whether there are jobs in the national economy that the

31

claimant could perform.  SSR 83-10, 1983 WL 31251, at *4 (1983).  The Commissioner

can satisfy his burden at this step by introducing the testimony of a vocational expert.  See

Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986).

   The ALJ first determined that Padilla was of "advanced age," had limited

education, and had experience in an area of work that had few transferrable skills.  He

noted that because Padilla retained the ability to do a range of medium work, reference to

the Grids directed a finding of no disability.  (Tr. 182).  Because Padilla was limited by the

requirement that he work in a clean-air environment, however, the ALJ deferred to Ms.

Clark's testimony concerning whether Padilla was capable of performing jobs that existed

in significant numbers in the national economy.  (Id.).  Considering Padilla's age,

education, past work experience, RFC, and clean-air limitation, Ms. Clark testified that

Padilla still could work as a bus person, for which there existed 300,000 jobs nationally,

and 20,000 in the New York City area, or as a hand packager, for which there were 50,000

jobs nationally, and 1,000 locally.  (Id. at 182, 416-17).  From Ms. Clark's testimony, the

ALJ concluded that Padilla was capable of performing jobs that existed in significant

numbers in the national economy and, thus, was not disabled.  (Id. at 182).

   Ms. Clark's testimony was substantial evidence upon which the ALJ could

properly base his disability determination.  Bapp, 802 F.2d at 603.  In addition, because

there was no evidence in the record that Padilla could not perform the tasks of a bus

person or hand packager, there is no reason to conclude that the ALJ's determination at

this step was erroneous.  See 20 C.F.R. § 416.966(e); Dumas v. Schweiker, 712 F.2d 1545,

1554 (2d Cir. 1983); Daniels v. Astrue, No. 10 Civ. 6510 (RWS), 2012 WL 1315322, at

*17 (S.D.N.Y. Apr. 18, 2012).

Accordingly, because Padilla was able to perform jobs that existed in

sufficient numbers in the national economy, the ALJ correctly concluded that Padilla was

not disabled.

V.      Conclusion

For the foregoing reasons, the Commissioner's motion for judgment on the

pleadings, (ECF No. 16), should be granted.

VI.     Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have fourteen days from the service of this Report and

Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule

72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any

such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to

the chambers of the Honorable Colleen McMahon and to the chambers of the undersigned

at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any

opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any

requests for an extension of time for filing objections must be directed to Judge McMahon.

The failure to file these timely objections will result in a waiver of those objections for purposes of appeal.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

Dated:        New York, New York
              August 15, 2013

                                    FRANK MAAS
                          United States Magistrate Judge

Copies to:

Hon. Colleen McMahon (via Hand Delivery)
United States District Judge

Fundador Padilla, pro se (via United States Mail)
155 E. 168th Street
Apartment 53B
Bronx, New York 10452

Susan C. Branagan, Esq. (via ECF)
United States Attorney's Office
Southern District of New York
86 Chambers Street, 3rd Floor
New York , New York 10007

34